IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JAMES M. SWEENEY, *et al.*,

  Plaintiffs/Counter-Defendants,

        v.

CITY OF WEST CHICAGO,

   Defendant/Counter-Plaintiff.

Case No. 08 C 2223

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Cross-Motions for Summary Judgment. The Plaintiffs move for Summary Judgment on all their claims, while Defendant moves for Partial Summary Judgment on its Counterclaim. The Motions are denied.

## I. BACKGROUND

Plaintiffs are Trustees of the Midwest Operating Engineers Welfare Fund (hereinafter, the "Fund") and suing on its behalf. The Fund is an employee welfare benefit plan under the Employee Retirement Income Security Act ("ERISA"), 20 U.S.C. § 1001, *et seq*. The Fund provides health benefits to certain employees of Defendant City of West Chicago (hereinafter, the "City") as the beneficiary of an agreement between the City and Local 150 of the International Union of Operating Engineers ("Local 150"). In return for this

coverage, the City is obligated to make regular payments to the Fund for each covered employee.  The present dispute concerns these payments and whether the City underpaid or overpaid the Fund.

This deal began when the City and Local 150 entered into an "Interim Agreement" on May 3, 2005 which contained numerous employment provisions.  The substantive portion relating to the Fund remained essentially the same when the full Collective Bargaining Agreement (the "CBA") was signed in December 2006.  The CBA, in relevant part under Article XI, reads:

> [A]ll bargaining unit employees shall be eligible to participate in the [Fund]. . . . For the insurance year July 1, 2005 through June 30, 2006, the City will pay $375 per month for single coverage and $750 per month for family coverage for eligible covered bargaining unit employees enrolled in the Union's Plan. [List of increased  monthly rates for subsequent years].
>
> . . . .
>
> Unless mutually agreed to otherwise, the City agrees to remit payment on a monthly basis by the tenth (10th) of the month preceding the coverage month (*e.g.*, the August payment will be paid by July 10th).

The Motions for Summary Judgment address three major disputes: (1) the date of the initial contribution for a new employee; (2) whether the City gets a prorated refund when it paid for a full month of coverage on employees who terminated employment mid-month; and (3) whether the City was required to make contributions for

employees who were on strike.  The CBA does not provide further guidance on these subjects beyond the Article XI portion above. The parties submitted other documents to supply some of these details, and the next three sections will describe these submissions.

## A.  Initial Contribution

The first month for which the City must contribute to the Fund for a new employee is disputed.  The Fund argues that the first contribution due is for the month following the employee's hire date.  The City argues that its first contribution is due for the month after thirty days of employment.  The Fund's view on the initial contribution is based on the January 1, 2000 and January 1, 2008 versions of its Health and Welfare Plan of the Midwest Operating Engineers Welfare Fund (the "2000 Plan" and "2008 Plan"), which describe the coverage and policies of the Fund:

> [2000 Plan] An Employee shall become eligible for benefits on the first day of a Benefit Quarter after the Fund Office has received contributions from an Employer or Employers for 300 hours of work during a Contribution Quarter . . . [*e.g.*, 300 hours of work during August, September, and October determines eligibility for January, February, and March].

> [2008 Plan] The Initial Eligibility date for a Municipality Employee shall be the first day of the Month in which his employment with the Contributing Employer begins.

The Fund expands on these documents with the affidavit of David S. Bodley ("Bodley"), an Administrative Manager for the Fund. Bodley stated that prior to January 1, 2008 the policies established and administered by the Fund were consistent with those in the 2008 Plan. Further, Bodley stated that a "technical correction" was made to the 2008 Plan on February 16, 2010 which clarified that initial eligibility for Municipality Employees begins on the first day of the month *following* the month in which employment begins.

The City's view on the date of the initial contribution is based on affidavits and forms which suggest that the parties negotiated and agreed upon the City's view of the initial contribution. Affidavits from City employees Carol LeBeau ("LeBeau") and Tim Wilcox ("Wilcox") state that these employees met with representatives of Local 150 on April 24, 2006, after the Interim Agreement was signed, but before the CBA was signed. The affidavits claim they reached an agreement on that date that eligibility would begin on the first day of the month that follows thirty days of employment with the City. As further evidence that this new agreement was negotiated upon a change to the status quo, the City attached two authorization forms that bargaining unit

employees signed upon hire.  Form A is the original form and Form B
is the current form:

> [Form A]  While  the  City  of  West  Chicago  does  not
> determine eligibility for coverage or benefits, it is the
> understanding of the City of West Chicago that coverage
> under the Local 150 H&W Plan **begins the first day of the
> following month after my first day of my employment** by
> the City of West Chicago in a Local 150 bargaining unit
> position.

> [Form B]  While  the  City  of  West  Chicago  does  not
> determine eligibility for coverage or benefits, it is the
> understanding of the City of West Chicago that coverage
> under the Local 150 H&W Plan **begins the first day of the
> following month after 30 days of employment** with the City
> of West Chicago in a Local 150 bargaining unit position.

The  dispute  over  the  initial  contribution  date  concerns
contributions for sixteen bargaining unit employees.  Table 1 below
lists these employees, the month for which the initial contribution
was made, the authorization form used, and the amount Plaintiffs
claim is due to the Fund:

## Table 1: Initial Contributions

| Employee | Hire Date | Initial Contribution Month | Form | Claim |
|----------|-----------|----------------------------|------|-------|
| A | 10/31/05 | 11/2005 | None | $0.00 |
| B | 11/28/05 | 12/2005 | None | $0.00 |
| C | 12/05/05 | 01/2006 | A | $0.00 |
| D | 03/20/06 | 04/2006 | A | $0.00 |
| E | 06/19/06 | 08/2006 | A | $401.25 |
| F | 07/10/06 | 09/2006 | A | $401.25 |

| | | | | |
|---|---|---|---|---|
| G | 07/10/06 | 09/2006 | A | $401.25 |
| H | 10/02/06 | 11/2006 | A | $0.00 |
| I | 01/08/07 | 03/2007 | A | $401.25 |
| J | 07/23/07 | 09/2007 | A | $429.00 |
| K | 12/08/08 | 02/2009 | B | $859.00 |
| L | 12/16/08 | 02/2009 | B | $859.00 |
| M | 01/05/09 | 03/2009 | B | $859.00 |
| N | 01/05/09 | 03/2009 | B | $859.00 |
| O | 02/02/09 | 03/2009 | B | $0.00 |
| P | 07/06/09 | 09/2009 | B | $859.00 |

**TOTAL: $6,329.00**

## B. Prorated Termination Credits

The City took a prorated credit when it paid a full month contribution for an employee who terminated employment mid-month. It then applied this credit against the total amount due on the next contribution. The Fund claims this practice is improper because the CBA only permits whole month contributions, and also supports its argument with a reference to the 2008 Plan:

> [2008 Plan, Art. 3 § 2(b)(iv)(B) "Continuing Eligibility"] Continuing Eligibility will be determined on a Month-to-Month basis. . . .

The parties identified seventeen instances in which the City took this prorated termination credit. Table 2 below lists these

instances with the date of termination, the bill to which the credit was applied, and the amount Plaintiffs claim is owed:

**Table 2: Prorated Termination Credits**

| Employee | Last Worked | Credit Taken | Claim |
|----------|-------------|--------------|-------|
| 1 | 02/01/07 | 05/2007 | $802.50 |
| 2 | 06/01/07 | 08/2007 | $802.50 |
| 3 | 06/08/07 | 08/2007 | $294.25 |
| 4 | 06/08/07 | 08/2007 | $588.50 |
| 5 | 06/08/07 | 08/2007 | $588.50 |
| 6 | 06/08/07 | 08/2007 | $588.50 |
| 7 | 06/08/07 | 08/2007 | $588.50 |
| 8 | 06/08/07 | 08/2007 | $588.50 |
| 9 | 09/07/07 | 11/2007 | $658.57 |
| 10 | 08/15/08 | 10/2008 | $214.50 |
| 11 | 10/10/08 | 11/2008 | $581.90 |
| 12 | 10/17/08 | 12/2008 | $193.75 |
| 13 | 10/22/08 | 12/2008 | $249.39 |
| 14 | 05/08/09 | 07/2008 | $637.32 |
| 15 | 11/23/09 | 01/2010 | $100.10 |
| 16 | 12/10/09 | 02/2010 | $290.61 |
| 17 | 12/15/09 | 02/2010 | $443.35 |
| | | **TOTAL:** | **$8,211.24** |

### C. Strike Credits

All bargaining unit employees went on strike beginning on November 6, 2006, and returned to work on December 10, 2006. The

City paid the November contribution ($34,507.50) for these employees, which was due by October 10, 2006. The City did not pay the December contribution ($34,507.50) because it claimed a one month credit due to the strike. The City uses the 2000 Plan to argue that the credit was proper as striking employees were not eligible for coverage, so no contributions were required:

> [2000 Plan, Art. 1 § 20 "Employee"] A person, actively employed by a Contributing Employer on whose behalf payments are required to be made to the Fund.

> [2000 Plan, Art. 3 § 1 "General"] Employees shall become eligible for benefits if they perform covered work. . . .

The parties agree on damages for the strike credit dispute. If the credit was improper, the City owes the Fund $34,507.50. If the City was actually entitled to a credit for the entire strike period, and not just the single month credit it took, the Fund owes the City $5,380.20.

### D. Procedure

The Fund's Trustees sued the City to recover all delinquent contributions plus interest, attorneys' fees, and costs. The City countersued, seeking a credit for contributions misapplied to non-active employees, a declaration of its contribution obligations as well as the trustees' obligations in applying the contributions to employees, and attorneys' fees and costs. The parties filed the

instant Cross-Motions for Summary Judgment.  The Trustees seek Summary Judgment on all their claims in the amount of $49,047.74 plus interest.  The City asks for Partial Summary Judgment declaring that no further contributions are necessary for December 2006 due to the employee strike and that the Fund owes the City the sum of $5,380.20 based on this strike.

## II.  <u>LEGAL STANDARDS</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The record is construed in the light most favorable to the non-moving party.  *Sullivan v. Cox*, 78 F.3d 322 (7th Cir., 1996).

"Summary judgment is particularly appropriate in cases involving interpretation of written contracts.  If the contract is susceptible to only one reasonable interpretation, it is unambiguous and the court should determine its meaning as a matter of law."  *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir., 1998) (quotations and citations omitted).  "[S]ummary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the

express terms of the contract that forecloses any genuine issues of material fact." *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir., 1989).

### III.  DISCUSSION

ERISA, under 29 U.S.C. § 1145, provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

"Employers who fail to meet the Section 1145 obligation are liable for federal remedies, court costs, attorney's fees, and liquidated damages or interest under 29 U.S.C. § 1132(g)(2)." *Sullivan*, 78 F.3d at 324.  "[T]his remedy is limited to the collection of 'promised contributions'. . . ." *Laborers Health & Welfare Trust Fund For Northern California v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 549 (1988).  Disputes are therefore settled by interpreting the agreements at issue. *Central States, Southeast and Southwest Areas Pension Fund v. Hartlage Truck Service, Inc.*, 991 F.2d 1357, 1360 (7th Cir., 1993).  In determining the contribution obligations created by a plan or agreement, federal common law principles of contract interpretation govern. *GCIU*

*Employer Retirement Fund* v. *Chicago Tribune Co.*, 66 F.3d 862, 864-65 (7th Cir., 1995).

The Cross-Motions for Summary Judgment concern three distinct issues requiring contract interpretation. The first issue is whether Defendant owes the first monthly contribution for new employees. The second issue is whether Defendant is entitled to a prorated refund when it paid a full month contribution for an employee who terminated employment in the middle of the month. The third issue is whether Defendant owes contributions for employees on strike.

## A. Initial Contribution

Plaintiffs move for Summary Judgment on the claim that Defendant owes contributions for new employees beginning the month after the employee is hired. Defendant claims its first contribution is due for the month following thirty days of employment. For example, an employee begins work on March 15. In this hypothetical, Plaintiffs claim the initial contribution is for the month of April and payment is due by March 10, while Defendant claims the initial contribution is for May and payment is due by April 10.

The first step in determining contribution obligations under ERISA is to identify the agreement which requires contributions.

*Central States*, 991 F.2d at 1360. Defendant signed the CBA which requires monthly contributions to the Fund. The parties discuss no other contribution agreements so the inquiry will focus on the CBA. The parties reference the 2000 Plan, the 2008 Plan, and the Trust Agreement to support their interpretations of the CBA, but do not point out any reference or incorporation of these documents in the CBA. Therefore, these other documents should be used as extrinsic evidence in interpreting the CBA.

The CBA states that Defendant "will pay $375 per month for single coverage and $750 per month for family coverage for eligible covered bargaining unit employees enrolled in the Union's Plan." "Unless mutually agreed to otherwise, [Defendant] agrees to remit payment on a monthly basis by the tenth (10th) of the month preceding the coverage month." The CBA does not define the terms "eligible" or "covered." A reference to the plain meaning of these words is not useful in the context of insurance eligibility. Eligibility often depends on multiple complex factors which vary by insurer with no single dominant definition. If a contract is not susceptible to only one reasonable interpretation afer being placed in context, extrinsic evidence should be considered. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir., 1995). Even if the CBA is ambiguous on its face regarding the initial

contribution date, it is possible that extrinsic evidence could remove any ambiguities.

The course of dealings between parties can be used to shed light on the terms of their agreement. *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir., 1998); *Alexander v. City of Evansville, Indiana*, 120 F.3d 723, 727 (7th Cir., 1997). In the present case, the parties have stipulated to the course of dealing for the initial contribution, which is summarized in Table 1. For Employees A-D, up to March 20, 2006, Defendant's initial contribution was for the month following the month of hire, consistent with Plaintiffs' interpretation of the CBA. For Employees E-P, from June 19, 2006 to December 15, 2009, Defendant's initial contribution was for the second month following the hiring month, consistent with Defendant's interpretation of the CBA, with the exception of Employees H and O. Employees H and O started work on the second day of the month, and Defendant's initial contribution was for the month following the hiring month. This mixed course of dealing fails to remove ambiguity as it provides some support for each interpretation.

Plaintiffs suggest that the 2008 Plan definition of "eligible" clarifies the issue, but this suggestion is problematic. The 2008 Plan became effective on January 1, 2008. Ten of the sixteen new

hires for which the initial contribution is at issue began employment before this date. The 2000 Plan was in effect when these ten were hired and it contains entirely different initial eligibility terms. Further, it seems likely that the 2008 Plan did not even exist when the CBA was signed.

Plaintiffs attempt to avoid this problem by submitting an affidavit which claims that the initial eligibility rules used in practice were always the same as those in the 2008 Plan. This fails to help Plaintiffs' position. If the Plans do not define contribution obligations, then there is no reason to consider them in interpreting the CBA. If the Plans define contribution obligations, the affidavit illustrates that Plaintiffs failed to uphold the agreed upon terms while the 2000 Plan was in effect.

Plaintiffs also argue that the CBA gives them sole discretion to resolve coverage questions. Even if true, this argument does not resolve a dispute concerning contribution, not coverage, requirements. For example, if Plaintiffs unilaterally decided to cover employees for three months after termination, Defendant would not be obligated to contribute for this additional coverage because the CBA requires contributions only for employees. A fact finder may see these issues as related, but there is no requirement that they be coterminous. For example, even if Plaintiffs have sole

discretion over coverage questions, the parties may have agreed that new employees would not be enrolled until the first month following thirty days of employment. The CBA requires contributions for employees who are covered, eligible, *and* enrolled.

Plaintiffs' interpretation encounters a separate problem in regards to the payment due date. If an employee is hired on March 29, Plaintiffs' interpretation requires Defendant to have paid for April coverage by March 10, which could be before anyone knew the employee would even be hired. This situation actually occurred three times in the course of dealing, with Employees A, B, and D, but Plaintiffs explain this away by merely saying that payment can be made in a reasonable time under the CBA. While not fatal to Plaintiffs' interpretation, these ambiguities illustrate that the issue is not settled as a matter of law.

Defendant seeks to avoid summary judgment by submitting affidavits describing negotiations related to the initial contribution date. The affidavits claim that on April 24, 2006, months before the CBA was finalized, representatives of the Fund and Defendant agreed that Defendant's first contribution would occur on the first day of the month following thirty days of employment. These affidavits are consistent with the course of

dealing in Table 1.  The initial eligibility payments changed right after April 24, 2006 with only two exceptions.  Defendant's affidavits explain these two exceptions as a policy that if an employee starts work on the first business day of the month, benefits begin on the following month without a thirty-day delay. This avoids a long two-month delay for the start of benefits. Plaintiffs dispute these facts regarding negotiation.

In a light most favorable to Defendant, the CBA is ambiguous about the date of the initial contribution, and extrinsic evidence does not resolve this ambiguity.  Genuine issues of fact still exist regarding the negotiations, the course of dealing, and industry practice, and these factors are important in interpreting this contract.  Plaintiffs' Motion for Summary Judgment is therefore denied as to the claims for delinquent initial contributions for new employees.

## B.  Prorated Refunds

Plaintiffs move for Summary Judgment on their claim that Defendant improperly took prorated credits for months in which it fully contributed but the covered employee left employment in the middle of the month.  For example, a current employee quits on April 15.  In this hypothetical, Plaintiffs argue that Defendant still owes the April contribution, which was paid by March 10, but

Defendant is entitled to a refund of the May contribution, which was already paid by April 10.  Defendant argues that this situation would entitle it to a full refund of the May contribution and a refund of half the April contribution.  The analysis of this claim also starts with a review of the written agreement of the parties.

The CBA is silent on this specific issue.  Contribution requirements are listed in dollars "per month" and payment must be remitted on the tenth day of the month preceding the coverage "month."  While the contribution rate is expressed in months, the CBA is ambiguous as to whether this expression creates a rate, as Defendant argues, or it creates a set coverage period, as Plaintiffs argue.  The parties have not cited any cases which consider this issue.

Plaintiffs' first argument is that the CBA requires payments on a "monthly" basis with no provision for payments of periods less than a month.  This argument fails as a number of contracts require "monthly" payments but some of them permit partial-month refunds.  An apartment lease requires monthly payment and the tenant often must pay the full month's rent even if he or she abandons the premises before the end of the month.  On the other hand, utilities such as phone, cable, or internet service are often quoted in monthly rates but prorated refunds are given if the service is

terminated mid-month.  Given that there is more than one reasonable interpretation of "per month" charges, other evidence is necessary. Evidence regarding the industry practice in insurance or collective bargaining contracts may have been useful, but the parties never submitted any facts on this point.  The course of dealing between the parties was agreed upon in a joint stipulation and is summarized in Table 2 above, which suggests that Defendant always took a prorated credit when employees terminated mid-month.  A fact finder must weigh this among other factual evidence, such as the Fund's course of dealing with other employers, industry practices, when the Fund first knew Defendant was taking these credits, whether employees actually received benefits for the entire month, and each party's knowledge of the other's benefit termination policies at the time of agreement.

Plaintiffs' second argument is that the Court should defer to Plaintiffs' interpretation because the contracts grant them sole discretion to resolve questions concerning "the extent and scope of coverage."  This argument confuses Defendant's obligation to contribute to the Fund with the Fund's obligation to cover Defendant's employees.  The language and context of the clause make it clear that the contract seeks to prevent Defendant from meddling in the administrative decisions of a welfare fund, such as what

procedures are covered and which medical specialists may be visited. The clause does not vest a general authority in Plaintiffs to interpret the CBA and in particular the contribution requirements.

The CBA remains silent on the issue of prorated refunds, and a number of factual issues which can help define the terms of the contribution requirement are unresolved. Therefore, summary judgment is inappropriate at this stage on the prorated refund claims and Plaintiffs' motion is denied as to these claims.

## C. Strike Credit

Plaintiffs move for Summary Judgment on their claim that Defendant owes the December 2006 contribution, which Defendant did not pay because bargaining unit employees were on strike. Defendant moves for Partial Summary Judgment on this ground as well, asking for a refund from the Fund as it took a one month credit for the strike, but the strike lasted longer than one month. The parties concur that if Defendant is entitled to a refund, it would be in the amount of $5,380.20.

Plaintiffs argue that because contributions are only accounted for in month increments, and the employees worked at least part of both November and December 2006, Defendant owes the full contribution for the entire period. As discussed in the previous

section, factual issues need to be weighed to determine if the CBA's "per month" language sets out a rate or if it allows payment in only full month increments. This argument is therefore unpersuasive at this stage of litigation because the partial month coverage issue remains unresolved.

For the same reason, Defendant's arguments are insufficient at this stage. Even if it is correct that a contribution was not owed for employees on strike, it may still owe the December contribution if partial month coverage is not permitted. Plaintiffs' claim and Defendant's counterclaim cannot be decided until a finder of fact resolves the genuine issues of material fact regarding partial month coverage. Plaintiffs' Motion for Summary Judgment on the issue of the strike credit, and Defendant's Motion for Partial Summary Judgment on the same, are denied.

### D.  Liquidated Damages and Interest

The Cross-Motions for Summary Judgment are denied and no determination on liability has been reached. Therefore, Plaintiffs' Motion for Summary Judgment as to liquidated damages and interest is premature and also denied.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is denied and Defendant's Motion for Partial Summary Judgment is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 5/14/2010